JANUARY TERM, 1884, No. 388.　　　　　MAY 20, 1884.

## Lybe *et al. v.* Herr.

1. Where a deed reserved to the owners of the adjoining tract No. 1 the right "to conduct water from the spring on No. 2 to the said premises, and to enter upon the said No. 2 for the purpose of laying and repairing pipes and keeping the spring in proper condition for the conveyance of the water," *held* that no greater right was acquired by the reservation than if it had embraced not only the water, but also the ground whence it flowed, and that the rights of the contestant parties are those of adjacent land-owners. *Held, further*, that the owner of No. 2 cannot be enjoined from digging a well on his own land, although he may, in some unknown manner, interfere with the flow of water to the reserved spring.

2. Whenever a stream is so hidden in the earth that its course is not discoverable from the surface, there can be no such thing as a prescription in favor of an adjacent proprietor to have an uninterrupted flow of such stream through the land of his neighbor.

3. Wheatley *v.* Baugh, 1 Casey, 528, and Haldeman *v.* Bruckhart, 9 Wr., 514, followed.

Before MERCUR, C. J.; GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ.

Appeal from the decree of the Court of Common Pleas of *Lancaster County*, confirming the report of a master.

July 23, 1879, bill in equity filed by Eli Lybe and Laura M. Lybe, his wife, and M. B. Eshleman and Annie M. Eshleman, his wife, against Rudolph S. Herr.

After answer filed, the case was referred to George Nauman, as master, who found, *inter alia*, as follows:

In the year 1855, Peter E. Lightner became the owner of certain lands in Lancaster township, a short distance west of the city of Lancaster. On a portion of his premises, immediately south of the Columbia turnpike, his dwelling-house and other buildings were erected. He owned a field lying nearly north of his dwelling-house, between the Columbia pike, which bounded it on the south, and the Marietta turnpike, which bounded it on the north. In this field, a few feet from the Marietta turnpike, and about fourteen hundred feet from the house, there was a spring. This spring Mr. Lightner caused to be walled up and arched over, and conducted pipes from it under ground for the purpose of obtaining a supply of water at his buildings for domestic and farming purposes. The premises were supplied with water at five points. There was a hydrant in the yard, a fountain in the yard, and a spigot in the spring-house. In the dwelling-house, there was water in the kitchen and in the second story. This method of providing water furnished a supply which was generally abundant for all domestic and agricultural purposes, both during the life-time of Mr. Lightner, and, after his death, up to the digging of the well by the defendant which produced this controversy. There was also enough for the fountain, which was allowed to run during the summer as an ornament to the place. Mr. Lightner died in 1868, having made a will, by which he devised his dwelling-house and between eight and nine acres of land to his four daughters, of whom Mrs. Lybe and Mrs. Eshleman are two. He empowered his executors to sell his other lands, but instructed them to reserve to his daughters and their assigns the right to take water from the spring. Under the powers given in the will, the executors sold, *inter alia*, to Rudolph S. Herr, the defendant, on April 1, 1870, the field in which this spring is situated. The field contains about thirty acres.

The deed to Herr contains the following reservation: "Reserving, by force and virtue of a direction in the said will, the right to the devisees of the tract of land adjoining No. 1 on the west, their heirs and assigns, to conduct water from the spring on No. 2 to the said premises, and to enter upon said No. 2 for the purpose of laying and repairing pipes and keeping the spring in proper condition for the conveyance of the water." The field in which the spring is situated is described in the deed as

[Lybe *et al. v.* Herr.]

No. 2, and the tract of land adjoining No. 1 on the west is the parcel of land devised to Mr. Lightner's daughters. In 1874, the two other daughters conveyed their interest in the premises to Mrs. Lybe and Mrs. Eshleman.

On July 22, 1879, Mr. Herr began to dig a well in the field in which the spring is situated. The spring is a few feet distant from the Marietta turnpike, which is the northern boundary of the field. The well is about as far from the turnpike as the spring, and is distant from the latter about forty feet in a south-easterly direction. The bearing from the well to the spring was given by one of the witnesses, approximately, as north 51° west. During the first day, the well was dug through earth only and water was reached, but in no great quantity. On July 23, the digging was continued. After reaching a depth of twelve feet, rock was found. The rock was blasted to a depth of two feet further, and an abundant supply of water obtained. At this point the supply of water at the plaintiffs' house entirely ceased, and the further digging of the well was prevented by a preliminary injunction. The flow of water from the spring thus cut off from the plaintiffs remained entirely suspended until about Christmas of 1879, since which time it has run a little at the hydrant in their yard, which is the lowest point of supply. After the granting of the preliminary injunction, the well was partially filled up.

There was considerable conflict in the evidence given before the master. One engineer testified that the water in the spring was on the same level with that in the well; another, that there was a difference of eight or nine inches in their respective levels. Other witnesses differed widely as to the extent to which the spring and well were affected, each in its turn, by the removal of the water in the other, as to how the water entered them, after they had been emptied, and their sources laid bare as far as possible. Several witnesses testified that until at least two feet of water had been removed from the well, the spring was not perceptibly affected. But notwithstanding all this, the master is satisfied, from a careful examination of all the evidence, and finds as a fact, that there is some communication between the well and the spring; that the taking of water from one affects the amount of water in the other; that the digging of the well has materially injured the spring, from which, since the digging, the flow of water has been seriously diminished, to the inconvenience and damage of the plaintiffs. Exactly how this result was produced it is difficult to say. The

[Lybe *et al. v.* Herr.]

injury does not seem to have been caused by an interruption of the supply furnished by percolation, for, if this were the case, the filling up of the well, even partially, ought to restore the water. The master believes that the injury has been caused by some damage done to one of the subterranean sources of the spring, by the cutting or diversion of some stream flowing to it in the earth, but, if this be so, the source or stream so damaged, cut, or diverted, was one not perceptible by the senses, and its existence could not be ascertained by any means in the command of ordinary men.

The master further reported:

"That a serious injury has been done to the plaintiffs is unquestionable, but seems clear that, under the evidence as presented, they can have no redress in this proceeding. The case is one of the almost total destruction of a spring in which they have rights, by the action of the defendant on his own land. It seems, however, to be well settled that the owner of land is not entitled to recover for injuries to wells and springs situated thereon, if caused by the acts of an adjoining owner, if done in the exercise of his lawful rights on his own soil, and if such rights are exercised without malice or negligence. The law with regard to surface streams is well established, and while there has been much discussion and some conflict of decision with regard to subterranean waters, the master is satisfied that the great preponderance of authority supports the doctrine that an injury caused to a subterranean supply of water by the lawful acts of an owner of land is, unless the stream be well defined and its existence known or easily discernible, or unless the injury be caused by negligence or malice. *damnum absque injuria.*

In England the law seems to have been fixed by the decision in Acton *v.* Blundell, 12 M. & W., 336. In that case the plaintiff, Acton, owned a mill which was operated by water flowing from a well dug in his own premises by a former owner of both the mill and the land in which the well was dug. This well the plaintiff had enlarged for the purpose of increasing his supply of water. The defendant subsequently opened and sunk a coal mine on his own land, at a distance of three quarters of a mile from the plaintiff's well, the effect of which was to cut off the underground veins and currents of water which supplied the plaintiff's well and to prevent his operating his mill. It was held that if the defendant, in properly working a mine on his own premises, caused a diversion

[Lybe *et al.* v. Herr.]

of the water from the plaintiff's well and mill, he would not be liable therefor.

In Pennsylvania the question was first discussed at any length in Wheatley *v.* Baugh, 1 Casey, 528. Baugh carried on a tannery upon a piece of ground of about an acre in extent, upon which was a spring which was constantly used in the business. A copper mine having been discovered upon the adjoining farm, a shaft was sunk. This shaft being flooded with water, a steam engine was used to pump out the water which interfered with the operations of the miners. Shortly after the engine was started, the tanyard spring ceased to flow, and remained dry during the running of the engine. When the pumping ceased, the spring resumed its usual flow after an interval of about two weeks. Baugh brought the action to recover damages caused by the loss of the water. He obtained a verdict in the court below, but the judgment was reversed by the Supreme Court, on the ground that the evidence showed the spring to have been supplied by percolations only, and that the interruption of these formed no cause of action.     *     *     *

In Whetstone *v.* Bowser, 5 Casey, 59, it was held that where a subterranean flow of water had become so well defined as to constitute a regular and constant stream, the owner of the land above, through which it flowed, had no right to divert or destroy it to the injury of the person below. But the stream, in that case, was one of those not uncommon in a limestone region, which, in its course, entered a "sink," followed a subterranean channel for some distance, and then re-appeared upon the surface, its identity throughout being unmistakable.

The question was again discussed in Haldeman *v.* Bruckhart, 9 Wright, 514. Bruckhart was the owner of a tract of about sixteen acres of land, on which there was a large spring of water. Haldeman dug a pit to mine iron ore about three hundred and thirty feet from the spring. This pit was about forty feet deep, and whenever the steam pumps used to drain it were in full operation, the spring entirely dried up. When the pumping ceased, the spring recovered its natural flow in about forty-eight hours. The pit was entered by three distinct streams. The action was brought by Bruckhart for destroying or diverting the spring. Under the ruling of the court below, there was a verdict for the plaintiff, but the judgment was reversed by the Supreme Court.

The same doctrine has been asserted in other States. In New Albany and Salem Railroad Company *v.* Peter-

son, 14 Indiana, 114, it was held that if the owner of land made an excavation within his own premises thereby draining the well of another, the draining being caused by cutting off the underground springs or fountains which supplied the well, no action would lie.

In Greenleaf *v.* Francis, 18 Pick., 118, the plaintiff had dug a well on her own land, and drew water therefrom; the defendant, owning the adjoining lot, dug a well on his own ground and within five feet of the plaintiff's well, thereby diminishing her supply of water. The Court ruled that, in absence of malice, the injury was not actionable.

In Delhi *v.* Youmans, 50 Barb., 316, the destruction of springs caused by digging upon the defendant's own land was decided to be *damnum absque injuria,* in the absence of malice.

And in the very well considered case of Frazier *v.* Brown, 12 Ohio, St. 294, it was held that in the absence of anything arising from either express contract or positive legislation, no action would lie for the destruction, in the exercise of a lawful right, of a spring, caused by destroying the flow of sub-surface waters which, without any distinct, definite, and known channel, ooze, filter, and percolate in small veins from the lands of one into those of his neighbor.

It was, however, strenuously contended before the master that the rights of the plaintiffs were stronger from the fact that their claim to the water rested upon a reservation in the deed to Herr—that this reservation imposed a servitude upon his lands; that it imposed upon him the duty, as it were, of allowing the waters in his lands to flow into the spring of the plaintiffs, and restrained him from any acts, even upon his own property, which would interfere with the supply. But it is difficult to see why this should be so. · Surely, the rights of the plaintiffs cannot be greater than they would be if they owned the land upon which the spring stands, and a strip of ground leading from their own premises to it in which pipes could be laid, and by which access to it could be had. In that case, the water would be entirely theirs, but the case would, in the master's opinion, be ruled by the principles laid down in the decisions cited.

A somewhat similar question was recently decided in Brain *v.* Marfell, in the High Court of Justice, Court of Appeals, and reported in 20 Amer. Law Register, N. S. page 93. In that case, Brain and Marfell, being adjoining landowners, the latter sold to the former a well or spring, with

[Lybe *et al. v.* Herr.]

the sole right to all the water obtainable therefrom, with the right to lay pipes and conduct the water to his dwelling-house, with the right of entry for repairs or other proper purposes, and with the further declaration that the spring or well should be the absolute property of Brain, and with the further covenant that he should use, possess, and enjoy it without any interruption or disturbance by Marfel and his assigns.   Marfel sold a portion of his land to a railroad company, which made a tunnel through the premises, and thereby destroyed the spring. For this injury Brain brought suit against Marfel, relying upon the terms of the agreement.   It was held that while the action was, perhaps, not properly brought, as the company were not the assigns of Marfell, yet admitting that they were, the defendant had not, by conveying the spring in the manner set forth, deprived himself of the right to make improvements on his land, and the agreement did not prevent him from interfering, by means of underground operations, with the flow of water before it reached the spring head.

Under the grant from Marfel, the rights of Brain were certainly greater as against his grantor than the rights of the plaintiffs in this case against Herr.   The rights reserved for the plaintiffs, by the executors of Mr. Lightner's will, are the rights to conduct water, and to enter upon the land for the purpose of laying and repairing pipes, and keeping the spring in good order.

It was further argued that the conduct of the defendant showed malice.   Malice and negligence must be proved, and while the master thinks it most unfortunate that the defendant should have selected the spot chosen by him for digging his well, and while it would seem that having a field of thirty acres at his command, he need not have dug so close to the spring of the plaintiff, yet he cannot, from this mere fact of proximity, find that the defendant was actuated by malice.

Upon all the facts of the case, the master is of opinion that the bill of the plaintiffs should be dismissed, and he so recommends to the court."

The complainants filed nine exceptions to these findings.

The court below, PATTERSON, J., dismissed the exceptions, confirmed the report, dismissed the bill, and ordered complainants to pay the costs.

The complainants then appealed, and assigned as error the action of the court as above stated.

*S. H. Reynolds* and *D. McMullen* for appellants.

[Lybe *et al. v.* Herr.]

The fact that defendant dug within 42 feet of the spring, 1,400 feet away from where he desired to use the water, shows malice or negligence. A subterranean stream which supplies a spring with water cannot be diverted by the proprietor above for the mere purpose of appropriating the water to his own use: Smith *v.* Adams, 6 Paige, 435; Wheatley *v.* Baugh, 1 Casey, 531.

The cases cited by the master were those of adjoining land-owners. This case is that of an injury to an easement reserved out of the grant of the land to the defendant: Wheatley *v.* Baugh, 1 Casey, 528; Haldeman *v.* Bruckhart, 9 Wr., 514. In these cases the distinction between surface and subterranean streams as between owners of adjoining tracts is based upon the absence of any easement held by one party in the lands of another. The defendant had no right to so injure the spring as to destroy the easement reserved and rid his property of the incumbrance thereof.

*D. G. Eshleman* and *J. B. Good* for appellee.

The finding of facts by the master will not be set aside except for plain error: Kisor's Appeal, 12 P. F. Sm., 428; Sproull's Appeal, 21 *Id.*, 137. There was no evidence of malice, and it cannot be inferred from the exercise by appellee of his rights of property.

Smith *v.* Adams, 6 Paige, 435, cited by appellants, is disapproved in Delhi *v.* Youmans, 45 N. Y., 362. The case is ruled by Wheatley *v.* Baugh, 1 Casey, 528, and Haldeman *v.* Bruckhart, 9 Wr., 514; Gould on Law of Waters, S., 280.

A reservation is construed the same as a grant: Washb. on Easement, 526; 8 Bacon's Abr., 461; Bliss *v.* Greeley, 45 N. Y., 673. As the right of appellants does not extend to all the water, the appellee has an equal right to the water; but even if appellants had the sole right, the appellee would not be deprived of the right of interfering by underground operations with the flow of water before it reached the spring head: Brain *v.* Marfell, 20 Am. L. Reg., N. S. 93; Bliss *v.* Greely, 45 N. Y., 671.

October 6, 1884, the opinion of the Court was delivered by GORDON, J.:

In the deed of Peter Lightner's executors to Rudolph S. Herr, the appellee and defendant below, there was nothing reserved but a right, in favor of the devisees, of the tract of land adjoining tract No. 1 on the west, "to conduct water from the spring on No. 2 to the said premises,

[Lybe *et al. v.* Herr.]

and to enter upon the said No. 2 for the purpose of laying and repairing pipes, and keeping the spring in proper condition for the conveyance of the water.'' This is the limitation of the reserved easement, and beyond it there can be no presumption in favor of the grantors. We agree with the learned master that in this spring of water the plaintiffs, by the reservation, acquired no greater right than if it had embraced, not only the water, but also the ground whence it flowed. In other words, the rights of the contestant parties are those of adjacent land-owners and none other. Such being the case, the proposition is rather startling that Herr cannot be permitted to dig a well in his own land, because he may thereby, in some unknown manner, interfere with the flow of the water to the reserved spring.

Than the doctrine of subterranean percolations and water-courses, no subject has been more fully discussed in our books. We would refer more especially to the cases of Wheatley *v.* Baugh, 1 Ca., 528, and Haldeman *v.* Bruckhart, 9 Wr., 514, in which the matter has been fully considered and disposed of by Justices Lowrie and Strong. The latter case also successfully combats the idea advanced by the counsel for the appellants that a distinction must be made between ordinary percolations and subterranean currents or streams. The rule is, that wherever the stream is so hidden in the earth that its course is not discoverable from the surface, there can be no such thing as a prescription in favor of an adjacent proprietor to have an uninterrupted flow of such stream through the land of his neighbor. One reason given for this conclusion is that if the former can have such right, he can prevent the latter from the use of the water in his own soil—for a use and return of it, as in the case of surface streams, is impossible. But we need not pursue this subject, for the very able report of the learned master has relieved us from any such necessity, and we have nothing further to say except that, with him and the court below, we agree in the propriety of the dismissal of the bill.

The decree of the court of common pleas is now affirmed, and the appeal dismissed at the cost of the appellants.